## Case No. 8,497.

### LONSDALE CO. v. MOIES.

[2 Cliff. 538.] [1]

Circuit Court, D. Rhode Island. Nov. Term, 1865.

MASTER'S REPORT IN CHANCERY—VARIANCE FROM DECREE—EASEMENT—RIGHT TO TAKE WATER—NEEDFUL STRUCTURES—AMOUNT TO BE TAKEN.

The decree of the court was, that the complainants were confirmed in their right and title to divert and use the water of a certain stream, through a canal, for mill or other uses, subject to the right of the respondent to use the water of said river for irrigation only, in accordance with a reservation in the deed under which the complainants claimed, and also by virtue of a certain agreement between the canal company and the grantor in the said deed, and that the cause be referred to a master to ascertain and report the amount of damage, if any, sustained by the complainants in consequence of the insertion by the respondent of a flume or culvert in the bank of the canal, as admitted in his answer; also what structures were proper and needful to enable the respondent to enjoy and use the right to divert the water for the purpose of irrigation, in accordance with the reservation contained in the deed and the agreement. *Held*, that the decision of the master to the effect that the complainants were not entitled to any damages was inconsistent with the decree, which assumed that a wrongful act was charged in the bill and confessed in the answer, and therefore that the complainants were at least entitled to nominal damages. *Held*, also, that proper and needful structures, within the meaning of the decree, were not only such as would enable the respondent to enjoy and use the right to divert the water for the purpose of irrigation, but such as would enable him to do so, as far as practicable, consistent with the right of the complainants to insist that only so much water should be taken as might be reasonably necessary for that purpose; that the master erred in holding that it was not within his province to provide a safe preventative against any possible abuse of his right by the defendant; and that the cause must be again sent to the master under the present construction of the decree.

This was a bill in equity [against Miles G. Moies], and the case came before the court upon exceptions to the master's report. Decree having been entered for the complainants in 1857 [Case No. 8,496], the cause was referred to a master, with certain directions hereinafter mentioned. The decree was in substance that the complainants were confirmed in their right and title to divert and use the water of the Blackstone river, in the county of Providence in this district, through a canal formerly known as the Blackstone Canal, for mill or other uses, at Lonsdale, in accordance with the conveyance by Simon Whipple to Wilbur Kelly, dated March 21, 1826, subject to the right of the respondent to use the water of said river for irrigation only, in accordance with a reservation contained in the said deed, and in accordance also with an agreement dated March 16, 1826, between the commissioners of the Blackstone Canal Company and the said Simon Whipple. The instrument called the agreement purported to grant to the said Whipple, his heirs and assigns, the

privilege of taking water from said canal, when the water was running to waste or flowing over the dam or flash-boards thereof, sufficient for watering said interval land, to be drawn from said canal by three tunnels placed under the towing-path of said canal, the under side of said tunnels to be on a level with the top of the dam aforesaid, and not to exceed fifteen inches wide and six inches high, with slide-gates in the same to stop the run of water when not wanted for watering said land. The reservation in the deed was, "to said Whipple, his heirs and assigns forever, of the right of taking and drawing water either from the mill-pond by a trench, or through the Blackstone Canal banks, conformable to their agreement with me, whenever the water is running to waste over said dam, or flash-boards thereof, for the purpose of watering my interval land south of said Kelly's factory on the west side of the Blackstone river." The decision of the court was, that the complainants had made good their title, as against the respondent, to divert the water of the Blackstone river, saving only what was reserved for the purposes of irrigation in the last-mentioned deed. In the present opinion the court said: "It will be observed that the deed referred to expressly recognizes the privilege granted to the grantor of the deed in the prior agreement, as the alternative right of taking and drawing water secured in the reservation. The language of the decree therefore corresponds with the decision of the court; and in both the right of the respondent to use the water of the river is declared to be for irrigation only, and only in accordance with the agreement, and the reservation of the same as contained in the deed." The duties of the master, to whose report exceptions were taken were described in the decree as follows: First, to ascertain and report the amount of damage, if any, sustained by the complainants in consequence of the insertion by the respondent of a flume or culvert in the bank of the canal, as admitted in his answer. Second, to report what structures were proper and needful to enable the respondent to enjoy and use the right to divert the water for the purpose of irrigation, in accordance with the reservation contained in the deed, and the agreement referred to in the decree.

The following is the substance of those portions of the master's report necessary to be reproduced in this statement: Three tunnels had existed in the bank or tow-path of the Blackstone Canal since 1827, for irrigation upon the Whipple meadow. In 1852, the defendant substituted a flume or gateway with a sliding gate, for the central tunnel, the same being at the same height at the bottom as the former tunnel; assuming that, as the Blackstone Canal Corporation had been dissolved, and the tow-path had reverted to him, the agreement had become obsolete, but that his right to the water under

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

the reservation remained unimpaired. Upon this the litigation between the parties commenced. The grounds of the claim for damages, within the scope of the master's commission, was the following: That the said flume was so unskilfully and insecurely constructed by the defendant that the complainants' interests at Lonsdale were greatly imperilled, and that they were obliged to expend labor and materials in improving the structure. That the defendant, in March, 1852, inserted in the bank or tow-path of the canal a flume of much larger dimensions and greater capacity than the tunnel, and that through the said flume a quantity of water passed more than what could flow through the tunnel, to the damage of the complainants of from $1000 to $1500 per annum. Upon this the master reported that the ground for an estimate of the damages was too vague and insufficient; that the injury, if any, was damnum absque injuria; and that the complainants were not entitled even to nominal damages. As to the structures proper and needful to enable the defendant to enjoy and use the right to divert the water for irrigation purposes, the following recommendations were made: First, that the defendant henceforth draw his supply of water for irrigation through only two orifices: one at the flume, the other at some point between that flume and the lower or southernmost tunnel; economy and convenience, as well as the topography of the premises, dictating this arrangement. Second, that these orifices be securely constructed and inserted in or under the bank, the bottoms of which respectively shall be at such a height relatively to the Ashton dam, as that the water will flow into them whenever it is running over the Ashton dam proper (i. e. its cap-log), let the current in the canal be as rapid as it can be made by any conceivable management or use of water or water power at Lonsdale, or any improvements in the canal itself, at its mouth, or at the dam. Third, that said tunnels respectively each be of dimensions not exceeding twenty-two and a half inches in width and six inches in height, "with slide-gates to stop the run of water when not wanted for watering said" meadow. The master further reported it not to be within the scope of his duties to provide against any possible future abuse of his rights by the defendant.

Exceptions to the report were filed by the complainants, in which objection was taken to the fact that the master had assumed that the decree referred to him the construction of both the "reservation" and the "agreement;" whereas the court had already decided the rights of the parties under both. They also excepted to his ruling that no damages were recoverable by complainants, to his construction of the reservation and agreement, and to his decision as to what structures were necessary to enable the defendant to enjoy his right of irrigation. These exceptions, twelve in number, were overruled by the court, excepting the fifth, ninth, and tenth, which were as follows: "Fifth Exception. For that said master in and by his said report finds and awards no damages for the complainants, and rules that the injuries sustained by them are among the class known in the law as damna absque injuria, or among those to which the maxim de minimis, &c. applies; to which finding and ruling complainants except, as contrary to law and unsound in principle, and because said master should have ruled that complainants have sustained damage recognized by law, and should have estimated and awarded to the complainants the amount of such damage." "Ninth Exception. For that said master, in and by his said report, has ruled and reported as structures needful to enable the defendant to enjoy his rights, two tunnels, as specified in his said report, and has neglected therein to provide any means by which the improper flow of water through the same can be checked by the complainants, or on their behalf; whereas said master should have reported some means whereby such improper, unwarranted, and injurious withdrawing of the water could be prevented by them, or in their behalf. Tenth Exception. For that said master, in and by his said report, has decided and ruled, that under said decree, 'it is not his province to provide a safe preventative against a possible abuse of his right by the defendant,' in exercising his right of irrigation through the two structures, as provided and recommended by said master in his said report, and has also neglected to provide any safeguard against such abuse; to which ruling and omission so to provide safeguards, the complainants except as erroneous in point of law, and of fact as highly injurious and dangerous to the rights and interests of the complainants, and as contrary to the scope of the decree under which said master alone can act." The deraignment of title, so far as the same is necessary to be recited, appears in the opinion of the court.

B. R. Curtis, W. H. Potter, S. Ames, and W. Binney, for complainants.

T. A. Jenckes, for respondent.

CLIFFORD, Circuit Justice. Nothing can be more certain than the fact that the decree recognizes and declares the right of the respondent to divert water from the mill-pond or through the Blackstone Canal banks for the purposes of irrigation. The limitation to the exercise of the right for that purpose, as stated in the decree of the court, is, that it must be in accordance with the reservation contained in the deed, and in accordance with the described agreement.

The authority of the master was conferred by the decree in the cause, and in the per-

formance of his duties he was bound by its terms. The citation of authorities to support that proposition is unnecessary, as it is one universally acknowledged. Some reference to the instruments of title under which the respective parties claim will be necessary, in order to understand the nature of the present controversy, although both parties claim to derive their title from the same source. Prior to the 11th of December, 1809, Simon Whipple owned the whole estate in controversy; but the record shows that on that day he conveyed twenty thirty-second ($20/32$) parts of two tracts of land to his associates in the Smithfield Cotton and Woolen Manufacturing Company, without any reservation whatever. One of those tracts was situated in Cumberland and the other in Smithfield, in this state, as appears by the recitals of the deed. The record also shows that his associates on the same day conveyed to him twenty thirty-second parts ($20/32$) "of half the water to water the land of the said Simon Whipple, on the Smithfield side of the river, and for no other purpose," which may be raised by a dam to be erected by the company over Pawtucket river, leaving at the same time so much of the water raised as aforesaid as will be at all times sufficient to carry all the water-wheels necessary to work all the machinery in all the factories. mills, and other water-works which may at any time hereafter be by said company erected on any parts of the two lots of land described in the before-mentioned deed of the same, together with the right and privilege of drawing from said dam half said water for the purposes aforesaid, and conveying the same through any part of the Smithfield lot, provided the manner of taking out the water and conveying the same and the direction thereof shall be the most beneficial to the grantee and the least injurious to the grantors. The court said: "Reference is made to that deed, not only as showing the origin of the right to divert and use the water for irrigation, but as showing conclusively that the right at that period of time rested in grant, and not merely in reservation." The owner of the two tracts conveyed, by the deed referred to, only twenty thirty-second parts of the two tracts, as is obvious from the terms of the deed. The effect of the arrangement was, that the grantee retained the title to twelve thirty-second ($12/32$) parts of the tracts in himself. while he conveyed eight such parts to George Olney, two to George Smith, one to Thomas Arnold, five to Joseph Wilkinson, two to William Whipple, and two to Joseph Whipple, 2d, making thirty-two in all. The parties to the deed, including the grantor and grantees, entered into an agreement on the same day, reciting that they had formed themselves into a company for the purpose of manufacturing cotton and woolen goods, and agreed that each should hold as many shares of the capital stock of the company as he held parts or shares of the two tracts of land as specified in the deed. Passing through various mesne conveyances, the entire title to the premises. on the 1st of February, 1825, became vested in Wilbur Kelly, subject to the right and privilege of the original owner of the same, to water his land on the Smithfield side of the river as set forth in the deed from his associates to him, to which reference has been made. Before the last of these conveyances was made, however, the record shows that the Blackstone Canal Company had been duly incorporated, both by the legislature of this state and by the legislature of the commonwealth of Massachusetts. The original owner of the premises, with others, granted to that company in September, 1823. the right and privilege of constructing their canal over his land and estate in Smithfield, adjoining and south of the manufactory of Wilbur Kelly, on the west side of the Blackstone river, provided it was built not more than seventy feet wide. Consequent upon that license, which was irrevocable, the canal company granted to the said Whipple, on the 16th of March, 1826, his heirs and assigns, the privilege of taking water from said canal. when the water is running to waste or flowing over the dam or flash-boards thereof, sufficient for watering said interval land. to be drawn from said canal by three tunnels placed under the towing path of said canal. the under side of said tunnels to be on a level with the top of the dam aforesaid, and not to exceed fifteen inches in width and six inches in height. with slide-gates in the same to stop the flow of water when not wanted for watering said land. The said agreement recites that "said Whipple had the right of drawing and using the water from the mill-pond of said manufactory, to be taken by a trench to the interval land of said Whipple south of said manufactory on the west side of said river, and that by the construction of the said canal the said trench for watering said land would be interrupted and destroyed." The antecedent right of said Whipple is also expressly recognized and admitted in one of the recitals of the consideration for the grant, in which it is stated that he had the right to use the waste water from said mill-dam and pond for watering his said land. The language of the reservation contained in the deed referred to in the decree is equally explicit and comprehensive. The grantor reserves to himself, his heirs, and assigns forever, the right of taking and drawing water either from the mill-pond by a trench, or through the Blackstone Canal banks, conformably to the agreement of the 16th of March, 1826, whenever the water is running to waste over the said dam or flash-boards thereof, for the purpose of watering the described interval land south of said Kelly's factory, on the west side of the Blackstone river.

Recurring to the decree of this court, it is obvious that the first duty of the master was

to ascertain and report the amount of damage, if any, sustained by the complainants, in consequence of the insertion of the flume or culvert in the banks of the said canal by the respondent, as confessed in his answer. The conclusion of the master under this direction was, that the complainants are not entitled to any damages for the reasons stated in his report; but after careful examination of the subject, I am not able to concur in that conclusion. The conclusion, I think, is inconsistent with the decree of the court, which assumes that a wrongful act was charged in the bill of complaint, and that the allegation was confessed in the answer. Assuming the fact to be so, then the complainants were at least entitled to nominal damages. The second duty of the master was to report what structures are proper and needful to enable the respondent to enjoy and use the right to divert water for the purpose of irrigation, as specified in the decree. The master is correct, in the judgment of this court, in holding that reference must be had both to the reservation and the agreement, in order to ascertain the rights of the parties in this controversy. Lonsdale Co. v. Moies [Case No. 8,496].

The interlocutory decree entered under the order of this court is to that effect, and such undoubtedly is the true construction of the instruments. The reservation contained in the deed expressly adopts the agreement as defining the alternative right of the respondent, and the case would be no stronger in favor of that construction if the words of the agreement were recited in the reservation. Adopting that rule, the court is clear that the respondent holds the right of taking and drawing water either from the mill-pond by a trench, or through the banks of the canal, as provided in the agreement, whenever the water is running to waste over said dam or the flash-boards thereof, for the purpose of watering the interval land described in the respective instruments. The words of the reservation are, "whenever the water is running to waste, over said dam or flash-boards thereof," but the language of the agreement is, "when the water is running to waste or flowing over the dam or flash-boards," showing that the water is running to waste, within the meaning of the instruments, whenever it is running over the dam or flash-boards. The respondent has the right to take and draw the water as waste water whenever it runs over the cap-log of the dam, for the purpose described; and although he undeniably has the right also to take and draw the water when running over the flash-boards, still the complainants, when the head is sufficient to run over the cap-log, cannot, by the use of flash-boards to increase the height of the dam, restrict his right to take and draw the water. The meaning of the instruments is, that the right of the respondent to take and draw water attaches, when the head of the water is such, that if

unobstructed by flash-boards it would run over the cap-log of the dam, and it is equally certain that the right does not cease to attach because the head is sufficient, not only to run over the cap-log, but over the flash-boards, which usually add more than a foot to the height of the dam. On the other hand, while it is true that the respondent can take and draw the water for the described purpose whenever it runs over the cap-log of the dam, still he can only use it for that purpose, and only so much as may reasonably be necessary for that purpose. The agreement provides for three tunnels placed under the tow-path of the canal, and that the under side of the tunnels shall be on a level with the top of the dam.

The opinion of the court is, that the under side of the orifices, whatever they may be, should be on a level with the top of the cap-log of the dam, and that they should not exceed in all the maximum dimensions prescribed in the agreement. But a continuous flow of the water is not contemplated, because the agreement provides that the tunnels therein mentioned shall be constructed "with slide-gates in the same to stop the run of the water when not wanted for watering said land."

Proper and needful structures, within the meaning of the decree, are not only such as will enable the respondent to enjoy and use the right to divert the water for the purpose of irrigation, but such as will enable him to do so, as far as reasonably practicable, in consistency with the right of the complainants that only so much water shall be so taken and drawn as may be reasonably necessary for that purpose. Looking at the subject in that light, it is quite clear that it is the duty of the master to inquire into the subject, and, if reasonably practicable, to report such structures as will conform to the rights of both parties. The fifth, ninth, and tenth exceptions are sustained, and all the rest are overruled. Under the circumstances the cause must be again sent to the master, with instructions to hear the parties under the former decree, as explained and construed in the present opinion of the court.